## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF MIDDLE DISTRICT OF TENNESSEE AT NASHVILLE

|  |  |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE *ex rel.* [UNDER SEAL] | RELATOR'S **SEALED** COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. § 3729, |
| Plaintiffs, | *FILED IN CAMERA AND UNDER SEAL* |
| v. | *DO NOT PLACE ON PACER* |
| [UNDER SEAL] | *JURY TRIAL DEMANDED* |
| Defendants. |  |

## SEALED COMPLAINT

*DO NOT PLACE ON PACER*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE,
AT NASHVILLE

| | |
|---|---|
| **UNITED STATES OF AMERICA and** ) | |
| **THE STATE OF TENNESSEE** *ex rel* ) | |
| **JAMES SULCER,** ) | **Jury Demand** |
| **Plaintiffs,** ) | |
| ) | **RELATOR'S** <u>SEALED</u> **COMPLAINT** |
| **v.** ) | **PURSUANT TO THE FALSE CLAIMS** |
| ) | **ACT, 31 U.S.C. § 3729,** |
| **HCA HEALTHCARE, INC.,** ) | |
| **HEALTHTRUST PURCHASING** ) | *FILED IN CAMERA AND UNDER* |
| **GROUP, L.P., JOHN M. PAUL,** ) | *SEAL* |
| **INSIGHT ENTERPRISES, INC.,** ) | |
| **INSIGHT ENTERPRISES, LLC, and** ) | *DO NOT PLACE ON PACER* |
| **DOES 1-1000.** ) | |
| **Defendants.** ) | *JURY TRIAL DEMANDED* |

---

## COMPLAINT

---

*Qui Tam* Relator James Sulcer, brings this action on behalf of himself and in the names of the United States of America and the State of Tennessee, by and through his undersigned attorneys and alleges as follows:

### INTRODUCTION

1. This is a civil action brought by the United States for treble damages, civil penalties, damages, and costs under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, the Tennessee Medicaid False Claims Act, ("TMFCA") T.C.A. § 71-5-181 *et seq.*, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.

2. This action arises from the Defendants' fraud and conspiracy to violate the Anti-Kickback Statute by soliciting, receiving, and concealing a 3% kickback as a false "Group Purchasing Organization" rebate for non-GPO purchases and transactions

1

in violation of the False Claims Act ("FCA"), the Anti-kickback Statute ("AKS"), and the Tennessee Medicaid False Claims Act ("TMFCA"). This action encompasses the unlawful kickbacks and subsequent submission of false claims, materially false statements, and fraudulent documents that the Defendants knowingly caused to be presented to the United States, in violation of the FCA and the State of Tennessee, in violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181 *et seq.*

## PARTIES

3. Plaintiff James Sulcer is a citizen and resident of Davidson County, Tennessee. He is a employed by Zebra Technologies Corporation ("Zebra") as a senior account manager of sales in Zebra's Healthcare Division.

4. The Defendant HCA Healthcare, Inc. ("HCA") is an entity incorporated under the laws of the State of Delaware, with its principal place of business located at 1 Park Plaza, Nashville, Tennessee 37203. HCA is the parent corporation for dozens of healthcare entities located in Tennessee, and hundreds of other entities throughout the United States.

5. The Defendant HealthTrust Purchasing Group, L.P. ("HealthTrust") is a group purchasing organization ("GPO") organized as a for-profit limited partnership under the laws of the State of Delaware. HealthTrust's corporate headquarters are located at 1100 Dr. Martin L. King Jr. Blvd, Suite 1100, Nashville, Tennessee 37203. HealthTrust's general partner is owned by Defendant HCA. HCA has several indirect, wholly-owned entities that operate business lines providing services to

2

HealthTrust vendors. HealthTrust's General Partner, HPG Enterprises, LLC is a wholly-owned indirect subsidiary of HCA. HealthTrust serves over 1,500 hospitals and health systems with more than 35,000 other member locations and had an annual purchasing volume of $39 billion in 2019. HealthTrust serves as the GPO for consolidated service centers ("CSCs") and acts as the purchasing agent for members of each CSC. HealthTrust is also the GPO for various consolidated distribution centers ("CDCs") located through the United States and within this district. The HealthTrust GPO program focuses on acute healthcare providers, whereas HCA's AdvantageTrust GPO program focuses on non-acute care healthcare providers.

6. Defendant Insight Enterprises, Inc. ("Insight") is a for-profit corporation headquartered in Tempe, Arizona. Insight is the parent corporation for numerous entities, including "PC Mall" and other sales/logistics companies. In 2022, Insight reported annual sales in excess of $8.34 billion.

7. Defendant Insight Enterprises, LLC is, upon information and belief an entity affiliated with Defendant Insight and formed under the laws of the State of Tennessee with its principal office located in Cleveland, Tennessee.

8. Does 1-1000 are the unnamed individuals, entities, and enterprises which utilize the kickback-tainted products and equipment identified herein and submit claims for reimbursement to Medicare, TennCare, and numerous state Medicaid programs throughout the United States.

3

## JURISDICTION AND VENUE

9. As required under the False Claims Act, 31 U.S.C. § 3730 *et seq.* and the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-181 *et seq.*, the Relator has filed this action *in camera* and under seal, and has provided the United States Attorney for the Middle District of Tennessee and the State of Tennessee with a statement of all material evidence available at this time, including information related to the complaint.

10. The United States of America is named as a plaintiff pursuant to 31 U.S.C. § 3730(b)(1), and jurisdiction lies in this court pursuant to 28 U.S.C. §§ 1331, 1345, and personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a). This Court has jurisdiction over the Tennessee Medicaid False Claims Act claims pursuant to 31 U.S.C. § 3732(b).

11. Venue is proper pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) in that the Defendants are headquartered and/or conduct business in this district and the claims set forth in this complaint arose in this district.

12. The allegations contained herein are based on non-public information, and the Relator is the original source of the information, having direct and independent knowledge of the information on which these allegations are based. 31 U.S.C. § 3730(e)(4)(B).

4

## THE APPLICABLE LAW

13. The False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1) imposes liability on any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

14. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(1)(B) makes it unlawful for anyone to "knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility , service, or item for which payment may be made in whole or in part under a Federal health care program."

15. 42 U.S.C. § 1320a-7b(b)(2)(B) makes it unlawful for anyone who "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program[.]"

5

42 U.S.C.S. § 1320a-7b

16. Section 1320a-7b(b) defines remuneration to include "any kickback, bribe, or rebate" and payments "in cash or in kind." The OIG, in its advisory opinions, has stated that "[f]or purposes of the anti-kickback statute, 'remuneration' includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind." *See, e.g.,* OIG Advisory Opinion No. 16-10.

17. The Discount Exception. Under 42 U.S.C. § 1320a-7b(b)(3)(A), the AKS prohibitions do not apply to "a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program[.]" (hereafter the "Discount exception.")

18. The Group Purchasing Organization Exception. Under 42 U.S.C. § 1320a-7b(b)(3)(C), the AKS prohibitions do not apply to "(C) any amount paid by a vendor of goods or services to a person authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services reimbursed under a Federal health care program if—

> **(i)** the person has a written contract, with each such individual or entity, which specifies the amount to be paid the person, which amount may be a fixed amount or a fixed percentage of the value of the purchases made by each such individual or entity under the contract, and
>
> **(ii)** in the case of an entity that is a provider of services (as defined in section 1861(u) [42 USCS § 1395x(u)]), the person discloses (in such form and manner as the Secretary requires) to the entity and, upon request, to the Secretary the amount received from each such vendor with respect to purchases made by or on behalf of the entity;"

6

19. In order to receive protection from liability under the AKS, a business arrangement must fit squarely within a safe harbor. Substantial compliance is not enough.

20. Group Purchasing Organizations ("GPOs") are formed to pool the purchasing power of their members and use group volume as leverage to negotiate contracts with vendors to supply medical products for prices lower than would otherwise be available to member hospitals.

21. Under 42 C.F.R. § 1001.952(j), "remuneration" does not include any payment by a vendor of goods or services to a group purchasing organization (GPO), as part of an agreement to furnish such goods or services to an individual or entity, as long as both of the following two standards are met:

> **(i)** The agreement states that participating vendors from which the individual or entity will purchase goods or services will pay a fee to the GPO of 3 percent or less of the purchase price of the goods or services provided by that vendor.
>
> **(ii)** In the event the fee paid to the GPO is not fixed at 3 percent or less of the purchase price of the goods or services, the agreement specifies the amount (or if not known, the maximum amount) the GPO will be paid by each vendor (where such amount may be a fixed sum or a fixed percentage of the value of purchases made from the vendor by the members of the group under the contract between the vendor and the GPO).

[And]

> **(2)** Where the entity which receives the goods or service from the vendor is a health care provider of services, the GPO must disclose in writing to the entity at least annually, and to the Secretary upon request, the amount received from each vendor with respect to purchases made by or on behalf of the entity. Note that for purposes of paragraph (j) of this section, the term group purchasing organization (GPO) means an entity authorized to act as a purchasing agent for a group of individuals or entities who are furnishing services for which payment may be made in whole or in part under

7

Medicare, Medicaid or other Federal health care programs, and who are neither wholly-owned by the GPO nor subsidiaries of a parent corporation that wholly owns the GPO (either directly or through another wholly-owned entity).

42 C.F.R. § 1001.952.

22. The safe harbors for GPOS found in 42 U.S.C § 1320a-7b(b)(3)(C) and discounts in 42 U.S.C. § 1320a-7b(b)(3)A) apply only to a small subset of such transactions and very specific instances and the business arrangements must fit squarely within a particular safe harbor in order to exempt payments from a vendor to a GPO from violating the Anti-Kickback Statute.

23. A true GPO contract involves pricing that is made available to all members of the GPO and a vendor fee of up to 3% that is disclosed in the terms of a formal GPO contract. However, the fee paid by Insight to the HealthTrust GPO alleged as the fraudulent kickback scheme herein involves no GPO contract and the pricing is exclusive to HCA. The false "GPO fee" solicited by HCA and/or HealthTrust is a concealed kickback on all medical scanners sold to HCA by Insight.

24. The Anti-Kickback Statute also provides that "a claim that includes items and services resulting from a violation of [that Statute] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g).

25. As a result of the kickback-tainted transactions alleged herein, any claim from any HCA hospital or provider which includes services or a fee for the use of the medical scanners is an agreement that involves the sale of items for which payment may be made, in whole or in part, under a federal health care program. HCA providers that submit these materially false claim to Medicare violate the

8

False Claims Act. Even if HCA or HealthTrust is a non-submitting entity under Medicare, they are liable for causing the submission of kickback-tainted claims submitted by others under the FCA.

### ALLEGATIONS OF FACT

26. Relator James Sulcer has worked in the medical sales industry for decades. He is employed as a senior account manager of sales in the Healthcare Division of Zebra Technologies International, LLC ("Zebra").

27. Zebra is a manufacturer of various medical technologies, including scanner devices used by hospitals that enable hospital staff to scan patient's wristbands and charts in a hospital setting, which enhances the efficiency and accuracy of providing medical care and disbursing medications.

28. In September of 2020, John Xaysongkham, HCA's Sr. Tech for Field Operations, contacted Relator about Zebra's inclusion in HCA's Request for Information ("RFI") and Request for Proposal ("RFP") for replacement of the HCA Clinical Scanners used in HCA hospitals. Mr. Xaysongkham stated that HCA needed 75,000 medical scanners.

29. In October of 2020, Mr. Xaysongkham emailed Zebra the HCA Scanner RFP Template.

30. Relator drafted the RFP with two other vendors, including Insight Enterprises, Inc. ("Insight"), a partner with Zebra that provides the products or services requested in an RFP.

9

31. Due to the size of the order, Insight was the preferred partner to provide the medical scanners to HCA.

32. Pursuant to the negotiation, Zebra met with HCA and Meditech, which provides Electronic Health Records ("HER") solutions to HCA and required custom clinical software in order for the scanners to be used by HCA.

33. In November of 2020, Zebra submitted its final HCA Scanner RFP documents.

34. In January of 2021, Zebra approved its initial pricing to HCA and Insight Enterprises, Inc. ("Insight"), which is Zebra's partner for sales of the medical scanners in question.

35. In February of 2021, HCA requested a thirteen hospital Pilot Project to test the Zebra scanners as part of the RFP. Zebra complied with HCA's request and provided both the scanners and technical support for the Pilot Project.

### THE DEFENDANTS' UNLAWFUL "GPO" KICKBACK SCHEME

36. In July of 2021, Jonna Lyons, Insight's Client Executive for HCA, emailed Relator and stated that she added a 3% HealthTrust Purchasing GPO Fee to Zebra's price to Insight.

37. During a telephone call, Jonna Lyons informed Relator that she has dinner with the HealthTrust CFO, who identifies the large contracts in which he wants her to add the 3% GPO fee. The HealthTrust CFO asked Ms. Lyons to add the 3% "GPO fee" to the Zebra purchase secured by Relator, even though it was not an actual GPO acquisition.

10

38. Jonna Lyons indicated that she had regular dinner meetings with the HealthTrust CFO and that the purpose of the meetings was for the CFO to select the largest contracts he would like to include the kickback concealed as a 3% "GPO fee."

39. The Chief Financial Officer for HealthTrust is John M. Paul.

Under this arrangement, if Relator sold a medical scanner to InSight for $236.29, after InSight adds their price and the rebate, the price to HCA is $249.99. HCA will then pay $249.99 per device, but at the end of the year or some other agreed upon date, Insight will pay the rebate in cash to HCA.

40. Relator questioned Lyons' inclusion of the 3% GPO Fee because the transaction did not involve a GPO Contract and was exclusive to HCA only. The transaction was not reviewed, selected, or contracted with any HealthTrust GPO.

41. Although Zebra has previously been involved in HealthTrust GPO Contracts, such contracts are very specific and must involve HealthTrust employees in the contracting and negotiations process. Unlike a true GPO contract, no HealthTrust employees were involved in any part of the medical scanner deal or negotiations between Zebra, Insight, and HCA.

42. Based on HCA's needs, the confirmed sale of 75,000 medical scanners over three years will likely exceed 90,000 medical scanners total, with the total value of the contract increasing from $17 million to $21 million over the life of the proposal. As of April 2022, HCA has ordered over 23,000 Zebra/Insight medical scanners under the RFP.

43. When a true GPO purchase is involved, HCA and/or HealthTrust utilizes a GPO purchase order database so that members of the purchasing group can access the GPO inventory by specific SKU number and obtain the GPO pricing.

44. Despite the lack of any GPO involvement in the medical scanner deal, HCA and/or HealthTrust initially listed the Zebra/Insight medical scanners in its GPO purchasing system. However, when LifePoint, an HCA GPO member, requested the HCA scanner pricing, Insight refused the LifePoint purchase order request because the medical scanners were never part of a true GPO contract. LifePoint was therefore not entitled to GPO pricing.

45. In response, HCA either removed the Zebra/Insight medical scanners from its GPO purchasing system or marked the scanners as "ineligible" in the system in order to cut off any additional purchase order inquiries from the HealthTrust GPO members and further conceal the 3% kickback.

46. The 3% kickback is "remuneration" in exchange for the sale of goods and services under the Anti-Kickback Statute. The remuneration is offered by Insight and accepted by HCA and HealthTrust so that Insight remains a favored company for awarding future contracts for medical equipment and supplies.

47. Defendants HCA and HealthTrust willfully or knowingly solicited and were offered remuneration in the form of a kickback by Defendant Insight. Their acts to conceal the kickback further demonstrate their intent to violate the AKS and the FCA. Under the AKS, remuneration includes supplying one good at a reduced charge to induce the purchase of another good or service.

48. The fraudulent Kickback Scheme identified herein is a routine practice between HCA and Insight. Based on Relator's conversation with Jonna Lyons, HCA and HealthTrust engage in the routine practice of concealing illegal kickbacks as false 3% "GPO rebates" on all major HCA contracts with not only Insight, but other vendors of medical equipment.

49. Upon information and belief, the Defendants' illegal kickback scheme involves hundreds of millions of dollars of kickbacks and the subsequent submission of kickback-tainted claims in violation of the FCA.

## KICKBACK-TAINTED CLAIMS ARE ULTIMATELY SUBMITTED TO MEDICARE FOR REIMBURSEMENT BY HCA AND HEALTHTRUST AFFILIATED PROVIDERS

50. Each scanner has a six to seven year useful life, and is used for patient care in HCA hospitals. The Defendants' various institutional and individual providers then bill patients and submit claims for reimbursement to Medicare to recoup the upfront cost of the Zebra/Insight medical scanners.

51. The Defendants' unlawful Kickback Scheme described above has caused the submission of false and fraudulent claims downstream by HCA providers that use the medical scanners, as well as the creation and use of false records and statements for the purpose of having false and fraudulent claims submitted to, paid, and/or approved by Medicare.

52. Providers at HCA hospitals must certify compliance with the Anti-Kickback Statute contained in the Provider Agreement in which health care providers attest by signing the Medicare Enrollment Form. Form CMS-855A is submitted by

13

institutional providers and form CMS-855I is for physicians and non-physician practitioners. Both forms contain nearly identical language as follows:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to [me]. The Medicare laws, regulations, and program instructions are available through the [Medicare] contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

53. In addition, when claims are submitted to Medicare they contain a similar certification of compliance as that listed above.

54. When a provider submits a claim for payment, they do so subject to and under the terms of its certification to the United States that the services for which payment is sought were delivered in accordance with federal law, to include the Anti-Kickback Statute.

55. HCA and HealthTrust understand and are aware that payment for provider services in which the cost of the medical scanners will be billed in part and recouped over the life of the scanner is conditioned upon express compliance with the Anti-Kickback Statute and the False Claims Act or, at a minimum, implied compliance with these statutes.

56. Hospitals bill patients for "Routine Services" as defined by the Centers for Medicare and Medicaid Services ("CMS") Provider Reimbursement Manual, Chapter 22-Section 2202.6. These charges include inpatient routine services or "room and board" charges because the use of the medical scanners are not customarily billed as a separate charge.

14

57. Medical equipment and supplies that are reusable, including the Insight medical scanners, are considered by CMS to be "packaged," and the costs of the equipment are therefore included in the charge for other patient procedures and treatment which are submitted to Medicare and state Medicaid agencies for reimbursement.

58. Defendants HCA and HealthTrust knew that the illegal 3% kickback is a violation of the AKS when the HCA- and HealthTrust-affiliated hospitals that utilize the scanner presented or caused their providers to present Medicare claims for reimbursement.

59. Compliance with the Anti-Kickback Statute is material and influences the government's decision to pay claims submitted to Medicare. Because the government would not pay kickback-tainted claims, all claims submitted by providers who utilize the kickback-tainted medical scanners purchased by HCA/HealthTrust are false claims under the FCA.

60. Defendants HCA, HealthTrust, and Insight are liable under 31 U.S.C. § 3729(a)(1) for knowingly assisting or causing false or fraudulent claims to be presented for payment or approval. Defendants are liable under 31 U.S.C. 3729(a)(2) for knowingly assisting or causing false records or statements material to false claims from hospitals and providers that use the medical scanners and other medical equipment tainted by unlawful kickbacks.

61. All HCA- and HealthTrust-affiliated hospitals that present claims to Medicare or state Medicaid agencies certify compliance with the AKS and FCA, but the

15

certifications become false and also result in the submission of false claims due to the kickbacks alleged herein.

62. Upon information and belief, all HCA- and HealthTrust-affiliated hospitals that submit claims for Medicare or Medicaid reimbursement also submit annual Cost Reports that certify compliance with applicable instructions and require their services to comply with Medicare program requirements, including prohibitions against kickbacks.

## CAUSES OF ACTION

### COUNT ONE:
### VIOLATION OF THE ANTI-KICKBACK STATUTE
### 42 U.S.C. § 1320a-7a & 7b.

63.     It is a violation of 42 U.S.C. § 1320a-7b for any person to receive or offer remuneration, including a rebate, in return for purchasing leasing, ordering, arranging for, or recommending any good, facility, service or item or for referring an individual to a healthcare provider who charges the United States for any portion of the services provided to that person. Section 1320a-7b provides for criminal penalties, while Section 1320a-7a provides for civil monetary penalties.

64. The Defendants purchased medical scanners and concealed a 3% kickback under the guise that the kickback was a "GPO fee" paid by vendors under a GPO contract that is exempt from the safe-harbor provisions of the AKS. In fact, the HealthTrust GPO never purchasing the medical scanners for use of its GPO member affiliates, but solicited the fee as remuneration in violation of the AKS.

16

65. The Defendants engaged in a scheme of illegal kickbacks for the sale of medical equipment, including medical scanners, and received illegal kickbacks in violation of the Anti-Kickback Statute.

## COUNT TWO:
### VIOLATION OF THE UNITED STATES FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(A)
*"Presentment False Claims"*

66. From at least December of 2021 to the present, the Defendants knowingly caused to be presented or filed with the United States Government and paid through the Medicare program, claims which the Defendants knew were false by virtue of the unlawful Kickback Scheme alleged herein, or which the Defendants were grossly negligent and in reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, and which Medicare would otherwise not have paid, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and which fraudulent actions caused payment for the claims to be made by the United States Government.

67. By reason of the violation of 31 U.S.C. § 3729(a)(1)(A), the defendants have knowingly or recklessly damaged the United States Government in an amount to be determined at trial.

## COUNT THREE:
### VIOLATION OF THE UNITED STATES FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1)(B)
### "Records and Statements False Claims"

68. From at least December 2021 until present, the Defendants caused to be made or used by hospitals utilizing kickback-tainted medical equipment, false records or

17

statements material to false and fraudulent claims, which claims and certifications Defendants caused to be presented to the United States Government. The Defendants did so with knowledge that the certifications and claims were false, or with gross negligence or reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, and which caused payments for the claims to be made by the United States Government.

69. These false records submitted, and false statements made, by the Defendants, were material to the Government's decision to pay the Defendants and any third parties, including the Defendants' patients and pharmacists who submit claims in reliance upon the false statements and records submitted by the Defendants which were material to these third party claims. These false statements and records make the Defendants liable under the False Claims Act.

70. By reason of the violation of 31 U.S.C. § 3729(a)(1)(B), the defendants have knowingly or recklessly damaged the United States Government in an amount to be determined at trial

## COUNT FOUR:
## CONSPIRACY FALSE CLAIMS
### 31 U.S.C. § 3729(a)(1)(C)

71. Under 31 U.S.C. § 3729(a)(1)(C), any person who conspires to violate the False Claims Act is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 (adjusted to account for inflation with a current penalty range of between $11,665 and $23,331) plus 3 times the amount of damages which the Government sustains because of the act of such person.

18

72. Insight and HealthTrust conspired to violate the False Claims Act by concealing a kickback as a 3% GPO fee that they knew was false.

73. In performing the acts alleged herein, specifically the "presentment false claims" and "records and statements false claims" alleged above, the Defendants conspired to defraud the United States Government in violation of 31 U.S.C. § 3729(a)(1)(C) by engaging in an unlawful kickback scheme for reusable hospital equipment which the

74. The Defendants knew that these false records would have a material effect on the Government's decision to pay the claims and that the Government would not pay Medicare claims if it was aware that the equipment procured by the Defendants were tainted by illegal kickbacks and the costs recouped as part of the rates HCA Hospitals charge all patients as part of a bundled service, the hospital daily rate, or the room and board fees charged by the hospital.

75. By these actions, the Defendants conspired to commit violations of both 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B), all in violation of 31 U.S.C. § 3729(a)(1)(C), making the Defendants liable under the False Claims Act.

**COUNT FIVE:**
**VIOLATION OF TENNESSEE MEDICAID FALSE CLAIMS ACT**
**T.C.A. § 71-5-182(a)(1)(B)**
**"Records and Statements False Claims"**

76. From at least December 2021 until present, the Defendants caused to be made or used by hospitals utilizing kickback-tainted medical equipment, false records or statements material to false and fraudulent claims, which claims and certifications Defendants caused to be presented to the State of Tennessee, in violation of the

19

TMFCA, T.C.A. § 71-5-182(a)(1)(B). The Defendants did so with knowledge that the certifications and claims were false, or with gross negligence or reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, and which caused payments for the claims to be made by TennCare.

77. These false records submitted, and false statements made, by the Defendants, were material to TennCare's decision to pay the Defendants and any third parties, including the Defendants' patients and pharmacists who submit claims in reliance upon the false statements and records submitted by the Defendants which were material to these third party claims. These false statements and records make the Defendants liable under the TMFCA.

78. By reason of the violation of T.C.A. § 71-5-182(a)(1)(B), the Defendants have knowingly or recklessly damaged the State of Tennessee in an amount to be determined at trial.

### COUNT SIX:
### VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT
### T.C.A. § 71-5-182(a)(1)(A)
### "Presentment False Claims"

79. From at least December of 2021 to the present, the Defendants knowingly caused to be presented or filed with the State of Tennessee and paid through the TennCare program, claims which the Defendants knew were false by virtue of the unlawful Kickback Scheme alleged herein, or which the Defendants were grossly negligent and in reckless disregard to the facts and conditions that would indicate that the claims were inaccurate or inappropriate and false, and which Medicare would

20

otherwise not have paid, in violation of the TMFCA, T.C.A. § 71-5-182(a)(1)(A). ), and which fraudulent actions caused payment for the claims to be made by TennCare.

80. These false or fraudulent claims for payment or approval made by the Defendants were material to the State's decision to pay the Defendants, and constitute a violation of the Tennessee Medicaid False Claims Act, T.C.A. § 71-5-182(a)(1)(A).

81. By reason of the violation of T.C.A. § 71-5-182(a)(1)(A), the Defendants have knowingly and recklessly damaged the State of Tennessee in an amount to be determined at trial.

**COUNT SEVEN:**
**VIOLATION OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT**
**T.C.A. § 71-5-182(a)(1)(C)**
**"Conspiracy False Claims"**

82. In performing the unlawful acts alleged herein, including the "presentment false claims" and "records and statements false claims" alleged herein, the Defendants conspired to defraud the State of Tennessee in violation of T.C.A. § 71-5-182(a)(1)(C) by causing false or fraudulent claims to be paid, which damaged the State of Tennessee in an amount to be determined at trial.

83. Hospitals and providers certified compliance with the AKS and the FCA in order to participate and submit claims for reimbursement to TennCare. The Defendants caused those certifications to become false when the Defendants procured kickback-tainted medical scanners and other medical equipment tainted by kickbacks. The Defendants took numerous overt acts in furtherance of the conspiracy, including monthly dinner meetings to determine which of the largest

21

contracts would be used to conceal the 3% kickback, which constitutes conspiracy to commit violations of both T.C.A. §§ 71-5-182(a)(1)(A and (a)(1)(B), all in violation of T.C.A. § 71-5-182(a)(1)(C), making the Defendants liable under the Tennessee Medicaid False Claims Act.

## COUNT EIGHT:
## UNJUST ENRICHMENT

84. As set forth herein, the Defendants wrongfully received and retained the benefit of government monies paid by Medicare and Medicaid for services that were provided after being induced by illegal kickbacks that were therefore legally and factually false.

85. The monies exchanged by the Defendants and received by their hospitals and providers who bill for services reimbursed through Medicare and TennCare are benefits conferred by the United States and the State of Tennessee.

86. Defendants were unjustly enriched with those government monies from Medicare and TennCare which they should not in equity and good conscience be permitted to retain, which should be disgorged and returned to the government in an amount to be determined at trial for all kickback-tainted claims that have been submitted as claims under Medicare.

## COUNT NINE:
## PAYMENT BY MISTAKE

87. The United States and the State of Tennessee paid claims for Medicare and Medicaid reimbursement from hospitals owned or operated by HCA and/or HealthTrust based upon mistaken or erroneous understandings of material fact,

22

including all invoices which include payment for medical scanners and other equipment procured in exchange for illegal kickbacks.

88. Had the United States and the State of Tennessee known about the unlawful kickbacks, they would not have paid the Defendants sums of money in which they were not entitled.

89. As a result, the Defendants are liable to the Plaintiffs under a theory of payment by mistake.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs United States of America and the State of Tennessee *ex rel.* James Sulcer pray that judgment be entered against the Defendants, each of them jointly and severally:

1. For civil penalties and damages for the Defendants' violations of the Anti-Kickback Statute, 42 U.S.C. §§ 1320a-7a & 7b;

2. For civil penalties and damages for the Defendants' violations of 31 U.S.C. §§ 3729(a)(1)(A) to (C) and T.C.A. §§ 71-5-182(a)(1)(a) to (C);

3. That all damages be trebled pursuant to 31 U.S.C. § 3729(a);

4. For reasonable attorney's fees and costs pursuant to 31 U.S.C. § 3730(d), 31 U.S.C. § 3729(a)(3), and T.C.A. § 71-5-183(d)(1)(C);

5. That Relators receive a percentage of the recovery in accordance with 31 U.S.C. § 3730 and T.C.A.§ 71-5-183(d);

6. For pre-judgment and post-judgment interest;

7. That Defendants be found to have been unjustly enriched under Tennessee common law by virtue of the fraud alleged herein;

8. That Defendants be found liable to the United States and the State of Tennessee under the common law for payment by mistake;

9. In addition, Plaintiffs pray for such further and additional relief at law or in equity that this Court may deem appropriate or proper, including any penalties or liquidated damages that may be available.

**Plaintiffs demand a trial by jury for all issues so triable.**

Respectfully submitted,

THE BLACKBURN FIRM, PLLC


/s/ Bryant Kroll
W. Gary Blackburn (#3484)
Bryant Kroll (#33394)
213 Fifth Avenue North, Suite 300
Nashville, TN 37219
P: (615) 254-7770
F: (866) 895-7272
gblackburn@wgaryblackburn.com
bkroll@wgaryblackburn.com
*Attorneys for Relator James Sulcer*